UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

BABYGRANDE GLOBAL, INC.,

*Plaintiff*,

-against-

EVEN LABS INC.; ENRIQUE "MAG" RODRIGUEZ; and DAMIEN "DDOT" WASHINGTON,

*Defendants*.

---------------------------------------------------------------------x

Index No.: 1:24-cv-6785-JGLC

**MEMORANDUM OF LAW IN SUPPORT OF EVEN DEFENDANTS' MOTION FOR CASE-TERMINATING SANCTIONS**

**MEMORANDUM OF LAW IN SUPPORT OF EVEN DEFENDANTS' MOTION FOR CASE-TERMINATING SANCTIONS**

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................................ 1

II. THE AUGUST RECORDINGS REVEAL AN EXTORTION SCHEME .................. 6

A. Wilson offered Washington employment or money for the "Golden Ticket." 6

B. Wilson further suggested that Washington delay his document production to EVEN in order to maximize the effectiveness of the extortion. ........................ 8

III. THE AUGUST RECORDINGS CONFIRM THAT BABYGRANDE IS ENGAGED IN AN ABUSE OF PROCESS .................................................................................... 10

A. Babygrande has asserted unjustifiable damages claims, exacerbated by its efforts to hide Cooks from discovery. ............................................................ 11

B. Babygrande and its counsel improperly sued the Investor Defendants for leverage. .......................................................................................................... 14

C. Babygrande added Washington as a defendant in an effort to use him as leverage. .......................................................................................................... 17

IV. PARNESS WAS A PARTICPANT, NOT AN INNOCENT BYSTANDER ............ 17

V. THE APPROPRIATE REMEDIES FOR THE BAD-FAITH CONDUCT .................. 21

A. Dismissal With Prejudice Is Warranted ......................................................... 23

B. The Court Should Also Impose Fees and Costs Against Babygrande and Parness ............................................................................................................ 24

C. In the Alternative, the Court Should Strike Paragraphs 49-52 of the FAC And Order Other Relief ....................................................................................... 26

VI. CONCLUSION ......................................................................................................... 26

## TABLE OF AUTHORITIES

**CASES**

*13 East 124 LLC v. J&M Realty Services Corp.*, 222 A.D.2d 446 (1st Dep't 2023). .................. 25

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp.2d 124 (S.D.N.Y. 2000). ............ 21, 24, 26

*Baker v. Urban Outfitters, Inc.*, 431 F. Supp.2d 351 (S.D.N.Y. 2006) ....................................... 25

*Balestriere Fariello v. Gimlet Media, Inc.*, 24-cv-2155, 2025 WL 2925061
(2d Cir. Oct. 15, 2025) (summary order) ............................................................................. 24, 25

*Capitol Recs., LLC v. Vimeo,* LLC, 826 F.3d 78 (2d Cir. 2016) ................................................. 12

*Ceglia v. Zuckerberg*, 600 Fed. App'x. 34 (2d Cir. 2015)........................................................... 23

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).................................................................*passim*

*Lipin v. Bender*, 193 A.D.2d 424 (1st Dep't. 1993), *aff'd,* 84 N.Y.2d 562 (1994) ........................ 1

*Matter of Satin*, 265 A.D.2d 330 (2d Dep't 1999). ....................................................................... 25

*McKenzie-Morris v. V.P. Records Retail Outlet, Inc.*, 338 F. Supp.3d 333 (S.D.N.Y. 2022)...... 22

*Musi Inc. v. Apple Inc.*, 24-cv-06920-EKL, Dkt. 97, Order Granting Motion for Rule 11
Sanctions in Part (N.D. Cal. Mar. 16, 2026)............................................................................ 26

*National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976) .................... 21

*New Sensor Corp. v. CE Distribution LLC*, 367 F. Supp.2d 283 (E.D.N.Y. 2005). .................... 25

*Pitre v. City of New York*, 731 F. Supp.3d 661 (S.D.N.Y. 2024) ................................................ 23

*Ransmeier v. Mariani*, 718 F.3d 64 (2d Cir. 2013)....................................................................... 22

*Rates Technology Inc. v. Cablevision Systems Corp.*, 05-cv-3583, 2026 WL 3050879
(E.D.N.Y. Oct. 20, 2026). ......................................................................................................... 18

*United States Securities and Exchange Commission v. Collector's Coffee Inc.*, 338 F.R.D. 309
(S.D.N.Y. 2021) ........................................................................................................................ 19

*Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70 (2d Cir. 1986) .................................. 25

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19(2d Cir. 2012) .................................................. 12

*Viola Sportswear, Inc. v. Mimun*, 574 F. Supp. 619 (E.D.N.Y. 1983) ........................................ 25

*Young v. Office of the United States Senate Sergeant At Arms*, 217 F.R.D. 61 (D.D.C. 2003)...... 1

**STATUTES**

15 U.S.C. § 1117(a) ........................................................................................ 1, 16, 17, 24

17 U.S.C. § 505, 512(m) ........................................................................... 1, 12, 16, 17, 25

28 U.S.C. § 1927 ........................................................................................ 1, 16, 17, 22, 24

**RULES AND OTHER AUTHORITIES**

22 NYCRR 130-1.1 ........................................................................................................ 24, 25

Federal Rules of Civil Procedure 11 ................................................................... 1, 16, 17, 22

Federal Rules of Civil Procedure 37. ......................................................................... 1, 16, 22

New York Penal Law § 155.05(2)(e)(v) ........................................................................... 2

# I. INTRODUCTION

Defendants EVEN Labs, Inc. and Enrique "Mag" Rodriguez (together, "EVEN") respectfully submit this Memorandum of Law in support of their Motion for Case-Terminating Sanctions and for Other Relief pursuant to the Court's inherent authority, 28 U.S.C. § 1927, Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 11 and 37, and the Copyright and Trademark Act fee shifting provisions, 17 U.S.C. § 505, and 15 U.S.C. § 1117(a). EVEN seeks sanctions against Plaintiff Babygrande Global, Inc. ("Babygrande") and Babygrande's counsel, Hillel Parness ("Parness"), based on a sustained pattern of bad-faith conduct including a recently discovered extortion plot, abuse of the judicial process, the assertion of claims lacking any legitimate factual or legal basis, and the dilatory conduct of discovery in this case. This Memorandum is submitted together with the Declaration of Emma J. Hoffmann, dated March 27, 2026 ("Hoffmann Decl.") and the exhibits thereto.

The wielding of the Court's inherent power to impose sanctions is particularly appropriate where the offending parties have perpetrated fraud upon the court. *Chambers v. Nasco*, 501 U.S. 32, 42 (1991). The Court's inherent power reaches both conduct before the court, and that beyond the court's confines. *Id.* at 44. Moreover, under its inherent authority, the Court has the power to guard the integrity of its proceedings with case-terminating sanctions. While such sanctions are severe, they are within the Court's discretion. *Id.* at 44-45; *see also Young v. Office of the United States Senate Sergeant At Arms*, 217 F.R.D. 61, 67-71 (D.D.C. 2003) (dismissing case where plaintiff attempted to buy the testimony of witnesses and violated discovery orders, as here); *Lipin v. Bender*, 193 A.D.2d 424, 427 (1st Dep't. 1993), *aff'd,* 84 N.Y.2d 562 (1994) (dismissing plaintiff's complaint when plaintiff and its counsel improperly obtained information that led to an unfair advantage over defendants and attempted to use that information to force a settlement); *cf.*

*also* New York Penal Law § 155.05(2)(e)(v) (extortion includes efforts to "expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule").

From the outset of this litigation, Babygrande and its counsel have engaged in conduct that undermines the integrity of these proceedings. (*See* Hoffmann Decl. ¶¶ 14-31, 35-36). Among other things, they have filed frivolous claims against purported investors in EVEN, threatened the undersigned counsel with physical harm, refused to provide basic discovery of revenues and expenses without being compelled to do so, and violated at least three separate Court orders requiring production of the address of Aaron Scott, professionally known as Stove God Cooks ("Cooks"), a key witness in this case.[1] (*Id.*).

This Motion was precipitated by the production of recorded phone conversations between and among Plaintiff Babygrande (through Chuck Wilson, its CEO and owner), co-defendant Damien Washington, and Babygrande's counsel, Hillel Parness (collectively, the "Recorded Speakers").[2] The recordings span three phone calls recorded by Washington on August 5 and August 13, 2025 (the "August Recordings"). The August Recordings reveal a plot between Babygrande and Washington to extort money from EVEN while Washington was still an independent contractor with access to EVEN's proprietary information. (Hoffmann Decl. Exs. 1-10).

The Recorded Speakers planned for Washington to provide Babygrande with a "golden ticket" comprised of purported confidential EVEN information, unrelated to the claims in this case, that Washington told Wilson would cause a supposedly pending business deal to fall apart, which

[1] As the Court is aware, Cooks is the musical artist whose works were allegedly infringed.

[2] The Court ordered production of the recordings three times, on January 16, 2026 (Dkt. 183), again on February 5th, (Dkt. 199), a third time on February 6th (Dkt. 204). They were finally received on February 17, 2026.

Washington claimed EVEN needed to close urgently "like oxygen for an astronaut in space."[3] (Hoffmann Decl. Ex. 8, 136:18-19). Specifically, in exchange for providing the "golden ticket," it was proposed that Babygrande would dismiss Washington from the case and provide Washington with cash or a job. (*Id.*). Their idea was that Babygrande would then use the "golden ticket" to extort a large settlement from EVEN. (*Id.*). Wilson explained that rather than going to the third-party with the information to sabotage the EVEN transaction, Wilson would threaten EVEN to reveal the information instead. (*Id.*). If EVEN did not drastically increase its settlement offer beyond the minimal economic harm from the alleged infringements, Wilson and Washington would destroy EVEN by putting the ill-gotten information on "music business weekly." (*Id.*).

The extortion conspiracy ultimately broke down because the Recorded Speakers could not agree on which would come first: the unveiling of the "golden ticket," or Washington's dismissal from the case. (*Id.*). Wilson was concerned that the information might turn out to be unusable or not as significant as Washington claimed, but dismissing Washington from the lawsuit would be permanent. (*Id.*). Wilson explained he needed Washington to stay in the case because it provided him with some imagined "leverage" over EVEN, and reassured Washington multiple times that: "you are leverage against EVEN. If we get a settlement with EVEN, we don't need the leverage anymore." (Hoffmann Decl. Ex. 10, at 9).

Wilson even noted that because EVEN was a start-up, it would likely need its investors to pay, which is further evidence that Babygrande and Parness only sued the now-dismissed EVEN Investor Defendants because of their perceived ability to pay, despite there being no evidence they

[3] The information Washington was offering to provide was either false or did not exist. Washington claimed as much at the March 11, 2026 conference, framing the "golden ticket" information as "pure puffery and posture." (Dkt. 245, 40:10-11). But the fact that the purported information was not ever going to cause an important deal to crater is immaterial here: it is Babygrande's willingness to use the auspices of the Court for improper purposes that is the subject of this Motion.

participated in the alleged infringement, as already found by the Court. (Hoffmann Decl. Ex. 10, at 2; Dkts. 51, 72).

Instead of dismissing Washington from the case, Wilson came up with two alternative ways to show Washington that he could "count on" Babygrande acting favorably towards him if he provided the "golden ticket," with Wilson proposing alternatively that: (a) Babygrande compensate Washington for the information with a "non-refundable" payment as a showing of "good faith;" and (b) Babygrande would provide Washington with a job working with Cooks and other Babygrande-signed artists when the inevitable fallout occurred.[4] (Hoffmann Decl. Ex. 10, at 3). Wilson even claimed that he had already spoken with Cooks, and that Cooks was supportive of having Washington help manage his career. (*Id.*). However, the prospects of a money trail that could later be discovered by EVEN and the Court led to an impasse, and the plot was never consummated. (*Id.* at 20). But the Recordings reveal Wilson and Babygrande's willingness to use the court process for improper purposes.

After adding Parness to the call, Parness advised that it should not look like Wilson "chased inside information" that Washington probably "shouldn't be giving us." (*Id.* Ex. 8, 41:9-10). Wilson chimed in: "if it goes well, it won't reach the courts." (*Id.* 42:9-10). And Parness agreed: "For sure. It wouldn't reach the courts. If it turns out to be the 'golden ticket,' if you're right," Parness told Washington, "it will end the case." (*Id.* 43:3-9). The parties also discussed delaying the production of documents to EVEN that Washington had already provided to Parness, presumably because the parties recognized that the documents exculpate EVEN from some of the

[4] Washington originally pitched Cooks to join the EVEN platform without the knowledge that Cooks had a record label that allegedly owns rights to Cooks' musical works. On March 14, 2024, in a call between Washington and Cooks, Washington explained how the revenue split would work and noted, "If you got[ta] 'bust down' with the label or distributor or whoever, we can also make sure they get their piece as well. So ain't nobody mad and tripping out." (Dkt. 75-4, at 14; *see also* Hoffmann Decl. Ex. 2, 12:2-13:14 (Washington telling Wilson that Cooks told him he did not have a label)).

conduct alleged in the complaint, as discussed below. (*See* Hoffmann Decl. ¶¶ 14-17; Ex. 8, 11:20-13:12).

The four-plus hours of the August Recordings, as well as transcripts made from them (with accompanying errata), have been provided to the Court for review. (Hoffmann Decl. Exs. 1-9). The accompanying chart summarizes parts of the transcripts for purposes of this motion (Hoffmann Decl. Ex. 10), but EVEN respectfully suggests that the Court listen to the August Recordings as much is revealed by the speakers' tone of voice that cannot be fully captured through reading the interactions on the page alone. The recordings reveal a clear sanctionable and bad-faith plot by the Recorded Speakers to abuse the judicial system by extorting EVEN. Such conduct warrants case-terminating sanctions.

The Court has already cautioned Babygrande that it would dismiss this action with prejudice if it engaged in threatening conduct following an email from Wilson to EVEN's counsel threatening his safety. (Dkts. 65, 65-1, 70). The Court warned: "The email sent by Mr. Wilson is reprehensible…if Mr. Wilson engages in any further threatening conduct, the Court will dismiss this action with prejudice." (Dkt. 70). The August Recordings demonstrate a plan to threaten to inflict commercial harm on EVEN unless payment was made. Such bad-faith conduct falls squarely within, and exceeds, the type of misconduct that courts have held warrants dismissal with prejudice.

This action is a deliberate strategy to manufacture leverage, coerce payment, and exploit the judicial system. Such conduct requires sanctions with consequences, including the repayment to EVEN of its fees and costs. In the alternative, as explained below, EVEN believes that, at a minimum, the allegations in Paragraphs 49-52 of the First Amended Complaint (the "FAC") (Dkt. 28) should be stricken. EVEN also requests the Court order that all communications between and

among the Recorded Speakers related to the plot are non-privileged and must be produced, and other associated relief.

## II. THE AUGUST RECORDINGS REVEAL AN EXTORTION SCHEME

The August Recordings capture a series of discussions between and among Wilson, Washington, and Parness evidencing: (1) a conspiracy to extort EVEN for a higher settlement using information provided by Washington in exchange for money from or employment with Babygrande; (2) that Babygrande willfully filed frivolous claims against the Investor Defendants to increase pressure on EVEN; and (3) statements acknowledging that Babygrande's claims against Washington were added to the case in the FAC solely as "leverage" against EVEN. The recordings also evidence that Parness had full knowledge of Wilson's intentions and nonetheless participated in a coordinated abuse of the judicial process.

### A. Wilson offered Washington employment or money for the "Golden Ticket."

Wilson was the driving force behind the conspiracy to extort EVEN, offering Washington money or employment in exchange for the purported insider information, while driving the extortion strategy. Although Washington initiated the first call, his primary objective was to be dismissed from the lawsuit.[5] Wilson, however, concocted the various strategies to utilize the proprietary information Washington was offering. Wilson was the one who conceived of offering Washington rewards not related to dismissal from the case.

---

[5] In addition to seeking dismissal from the case, Washington's motives were also driven by his resentment of Rodriguez. (Hoffmann Decl. Ex. 8, 24:7-9 ("I'm willing to go the distance to–to pretty much punch Mag in his kidney and watch him fall on the ground and possibly bleed out."); *see also* Ex. 2, 36:13-16, Ex. 4, 10:2-4, 14:7-15, and Ex. 8, 24:3-5 (Washington either alluding to or directly threatening Rodriguez with physical harm)). Washington's harassment of EVEN and Rodriguez have only worsened since his termination by EVEN for cause in September 2025. If the Court is interested in what is going on in the background between EVEN and Washington, Washington's egregious conduct is detailed in the complaint filed in the District of Maryland, Civ. No. 8:26-cv-816, at Dkt. 1.

These discussions were not hypothetical. They reflect an active negotiation: Washington would provide information allegedly capable of derailing an important EVEN business deal, and Wilson would provide a rewarded—either through direct payment or a role at Babygrande. As Wilson explained, if the information proved valuable, it would "force EVEN to come up with a better settlement number," so they should collectively "jump on it quickly." (Hoffmann Decl. Ex. 8, 52:22-24).

Babygrande's attempts to frame Wilson as "not taking the bait" offered by Washington are demonstratively false. The August Recordings show the exact opposite: Wilson was a full and enthusiastic participant. The transcripts show his thought process for putting the information Washington was offering to its best use for Babygrande. Wilson referred to this lawsuit as a "game board," explaining to Washington how he would use it to "squeeze" EVEN. (*Id.* 9:2-5, 11:13-18). One example:

> WASHINGTON: I happen to know that it [the information] definitely would put them [EVEN] in a position where they [the third party] would have to reevaluate, pause, and even very highly likely terminate the deal as it -- as it's being progressed right now, to the finish line.
>
> WILSON: Right... that forces EVEN to come settle it with me. So I don't want to go to them [the third party] first. I don't want to go to the third party first. I want to go to EVEN and say, "Hey, this is what's going on, right? We don't like any of this stuff and, you know, we're going to keep it simple. Settle this or this is going to be, you know -- this is going to be on Music Business Weekly, Daily News, whatever-- what Billboard, everything, right? We're just going to blow this whole thing up because you guys aren't playing good-- good ball here."
>
> WASHINGTON: That's another – that's a very – I'll say to you that it's a very, very effective strategy to go that route as well.

(*Id.* 11:24-12:18) (brackets added for context). Babygrande cannot seriously claim Wilson didn't "take the bait" when he is on a recording proposing the Recorded Speakers should threaten EVEN

directly rather than interfere with their relationships by going to the third-party first. In exchange, it was Wilson (not Washington) who first suggested the payment:

> WASHINGTON: So, sidebar, what is this information worth to you?
>
> WILSON: I mean, like I said, if you want me to throw you some money to show you that I'm serious so that I pay you money and I use this shit and... it's nonrefundable… I could do that.
> …
> Listen, take your time. Do the risk assessment, but I think that's the play, man. Especially if it's this time-sensitive. Arm me with what I need to go force a settlement and put this whole thing behind us.
>
> WASHINGTON: Well, I'm there now. What I'm saying is, in addition to arming you, what are you-- like, what's it worth to you? The information.
>
> WILSON: It's not how much what it's worth. I just don't mind sending you a good faith payment to show—to, you know, nonrefundable payment, just so that you can see that I'm serious about this, I guess.

(*Id.* 19:6-12; 21:20-22:7). That is not the statement of an innocent bystander. Wilson also offered Washington a job to help Babygrande manage Cooks and other artists, claiming he had already spoken with Cooks about it and that Cooks was on board. (*Id.* 110:10-14).

### B. Wilson further suggested that Washington delay his document production to EVEN in order to maximize the effectiveness of the extortion.

Wilson also suggested strategically delaying Washington's document production to EVEN after Washington explained that it exculpated EVEN from the conduct alleged in Paragraphs 49-52 of the FAC. Those paragraphs falsely allege that EVEN is responsible for an email blast that Washington sent on behalf of Cooks attaching the works at issue via Mailchimp to Cooks' customers after EVEN had taken down the music from its platform. (Dkt. 28, at 11-13).

In the August Recordings, Washington repeatedly explained to Washington that EVEN had "nothing to do with" the email blast:

> So separately from EVEN is how that email thing happened, because Stove wanted to send it out. Like, this wasn't anything that I made him do. This is what he wanted to do. That's just me giving you the truth.

(Hoffmann Decl. Ex. 6, 4:3-5:12, 9:20-25; *see also* Ex. 10, at 15-16). That statement is consistent with contemporaneous evidence. When Washington was informed by Rodriguez that he had been added as a party to the FAC, Washington wrote, "They're [Babygrande] trying to conflate me working at even with Stove using my mail chimp. I wasn't a full time employee. And stove instructed me to act on his behalf outside of even." (Hoffmann Decl. Ex. 15; *see also* Ex. 14 (September 12, 2024 text from Rodriguez to Washington expressing surprise upon receiving the Mailchimp e-mail blast)(brackets added)). Washington also explains EVEN's lack of involvement in the e-mail blast in the presence of Parness. (Ex. 8, 54:16-24).

Because these texts were in Washington's document production made to Parness, but which Washington had not provided to EVEN, Wilson viewed delaying the production as opportunity to exploit the timing by proposing that rather than Washington share the production, as required, with EVEN, Washington withhold the documents until after Wilson could extract the unjustified settlement payment:

> WASHINGTON: Well, I got to give my discovery to EVEN now, apparently. So I'm going to do that.
>
> WILSON: Right -- right. And understand what that's-- now, you know, as you sleep on this thing, right, that's another strategic move. Do you give that to them first, or do we make this phone call [to EVEN] first? That's something you got to analyze. You may not want them to see that first… I may want them to get this death blow and then see that.

(Hoffmann Decl. Ex. 8, 108:9-22) (bracket added). Parness was present for this discussion but remained silent, providing his tacit approval of this tactic. And, in fact, Washington did not provide his production to EVEN until November 5, after EVEN accidentally found out about it

during a September 2025 meet-and-confer call with Parness about various document production issues, at which time Parness provided the documents to EVEN, followed by Washington producing them two months later. (*Id.* ¶¶ 14-16).

Babygrande cannot possibly assert that Wilson failed to "take the bait" while he is on the August Recordings discussing a "death blow" with Washington and Parness. (*Id.* Ex. 8, 108:21-22). While Washington should be credited for coining the term "golden ticket" to describe the confidential EVEN information he was proposing to illicitly provide, Wilson coined the phrase "death blow" to refer to using the information. Specifically, Wilson refers to giving EVEN "death blow(s)" six (6) times on the August Recordings, in furtherance of the extortion plot to present EVEN with the Hobson's Choice of paying up or risking the publicity that would be associated with the threat to publicly reveal the supposed "golden ticket" information. (*Id.* 108:22, 109:10, 109:12, 110:10, 110:15,110:23).

Although the extortion scheme was not completed, planning, discussing, and conspiring is, in the Court's words, also "wildly improper." (Dkt. 245, 30:14). And Wilson's suggestion that Washington delay his document production had a direct effect on the integrity of these proceedings because these calls occurred around the same time that EVEN discovered the issue of Washington's deletion of evidence, leading to his termination after his refusal to return EVEN's laptop and iPhone for forensic investigation.

## III. THE AUGUST RECORDINGS CONFIRM THAT BABYGRANDE IS ENGAGED IN AN ABUSE OF PROCESS

Although Washington and Wilson failed to reach an agreement on compensation, it ultimately does not matter whether the extortion was successful or the information was real. The Recorded Speakers conspired to give themselves an iniquitous advantage in settlement and

demonstrated a willingness to misuse the judicial system that is illustrative of the abuse that Babygrande has engaged in throughout this litigation.

### A. Babygrande has asserted unjustifiable damages claims, exacerbated by its efforts to hide Cooks from discovery.

EVEN earned less than $10,000 in profits from the alleged infringement, reflecting their revenue during the brief period of time Cooks was using EVEN's platform, less royalty payments made to Cooks, and less refunds made to Cooks' customers after EVEN removed the songs from the platform as a result of the lawsuit. (Hoffmann Decl. ¶ 28). Also, for context, while not usually an issue for the Court pre-trial, EVEN made a Rule 68 offer to Babygrande that was more than three times EVEN's profit from the alleged infringement. (*Id.*). Yet Babygrande's complaint unjustifiably seeks $26 million: $11 million for copyright infringement and $15 million for trademark infringement. Meanwhile, in discovery, Babygrande has revealed it has no basis for its demand: it has no projections, no revenue from the recordings or photographs at issue, and has done nothing to try to recoup its losses by either recouping the funds paid by EVEN to Cooks or otherwise releasing the music despite the passage of 18 months since the alleged infringement.[6] (Hoffmann Decl. ¶¶ 34, 38-39).

---

[6] The alleged infringements arise solely from Cooks' own conduct, yet Babygrande made the strategic decision not to seek redress from Cooks. (*See generally* Hoffmann Decl. Ex. 17). In the recordings, Wilson repeatedly makes false claims about Cooks' motivations for using EVEN's platform and about how "rappers" behave, all conjecture layered on inappropriate stereotypes. (Ex 10, at 11-15). Throughout the record, Wilson offers sweeping generalizations about why artists "just try to get a bag" or why they would choose to release music through a platform like EVEN's without authorization, and then uses those assumptions as a substitute for actual facts. (*Id.* at 12). In actuality, at the time Cooks opened his account and used EVEN's platform, it had been four years since Babygrande released new music for Cooks. Cooks' motivation was to get his music out, not to just "get a bag." Despite the agreement between Babygrande and Cooks being signed in 2020, to this day Babygrande has not released a single recording by Cooks, and merely has participated economically in recordings Cooks made as a feature on other artist's tracks. In fact, this morning, it was reported that Babygrande has blocked Cooks from releasing other music. (Hoffmann Decl. Ex. 22). Wilson's inadmissible musings about what Cooks may have been thinking are not a substitute for admissible proof, but for purposes of this motion, are further evidence that his over-active speculation is driving Babygrande's litigation strategy divorced from any actual facts.

The limited revenue documents that Babygrande has now been compelled to produce and that pertain to other Cooks works (where he was a feature performer on recordings not released by Babygrande) show that reasonable damages would be no more than a few thousand dollars. (Hoffmann Decl. ¶¶ 18, 21, 27-28) (walking through the months-long efforts that EVEN had to undertake to compel Babygrande to finally produce *any* revenue documents to support its damages claims, of which production is still not complete, despite a March 25th deadline imposed by the Court. (Dkt. 237).

Rather than being based on any legally cognizable damages theory, Wilson appears to have a delusional belief, that because he invested four years of his time in Cooks' career, Babygrande "deserves" to be over-compensated for a problem that Cooks himself caused. (*See, e.g.*, Hoffmann Decl. Ex. 8, 14:18-19, 53:15-18; Ex. 17, at B001482 (Wilson to Cooks: "Then [EVEN] will be mine")).[7]

Discovery has revealed that before the lawsuit was filed, Wilson was aware that Cooks had himself provided the works to EVEN. Yet Babygrande still filed the complaint against EVEN and its perceived investors containing allegations inconsistent with that knowledge. In text messages between August 27 and August 31, 2024, consisting of eighty-eight (88) pages, Wilson berated Cooks for providing the works to EVEN. (*Id.* Ex. 17).[8] Cooks repeatedly points out that the works

[7] It also bears noting that Wilson's legal theories concerning the diligence he believes EVEN should have conducted before onboarding Cooks as a customer is delusional: among other things, he invented an obligation for EVEN to make sure Cooks had a lawyer before allowing him to offer his music directly to his own fans using EVEN's platform. (Ex. 8, 6:7-15; 14:22;15:5-8). EVEN was not obligated to perform the "due diligence" that Wilson hypothecates, nor would such intensive monitoring even be feasible for a service provider like EVEN. Section 512(m) of the Copyright Act expressly provides that safe harbor protection under the DMCA "cannot be conditioned on affirmative monitoring by a service provider." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012); *see also Capitol Recs., LLC v. Vimeo,* LLC, 826 F.3d 78, 98 (2d Cir. 2016).

[8] Notably, the text chain is incomplete, missing most dates and times, and includes audio messages that still have not been produced, despite numerous requests, and promises by Parness that they would be provided, yet another discovery violation by Babygrande and Parness. (*See* Hoffmann Decl. ¶¶ 35-36).

at issue had essentially been abandoned by Babygrande for over two years, and Babygrande was never going to release them. (*Id.* at B001401, 1410-1417, 1473, 1476). Among other reasons, Babygrande could not clear any of the samples on the tracks, including one owned by the Estate of Marvin Gaye. (*Id.* at B001450). Accordingly, the works had virtually no value to Babygrande, let alone $26 million.

Surprisingly, Wilson admits several times in the chain that he had never listened to the tracks, yet his complaint refers to the works as the "most anticipated release from any artist in many years." (FAC ¶ 28). In the texts, Cooks also complains that until he saw Babygrande's initial takedown notice to EVEN, he was unaware that Babygrande was claiming trademark rights in his persona. (Hoffmann Decl. Ex. 17, at B001434-1436). The texts reveal that from the get-go, Wilson was focused on EVEN's investors because he was looking for deep pockets. (*Id.* at B001406, 1408, 1471). Further, Wilson forbids Cooks from providing his contract to EVEN, who was asking for it to address competing DMCA takedown notices and counternotices from Babygrande and Cooks (sent by email under penalty of perjury), where both of them were claiming ownership of the works. (*Id.* at B001487 (referring to Cooks' counternotice (Ex. 18)).

Babygrande's lack of exploitation of the works at issue underscores the absence of damages, and its strained relationship with Cooks explains why it has gone to so much effort to evade Cook' deposition, including Babygrande's admitted violation of the Court's order for Wilson to directly ask Cooks for his address so that EVEN could serve a subpoena for his testimony. (Dkt. 199; Dkt. 245, 23:24-24:3). Babygrande's purported control over Cooks' entire catalog is highly questionable. Cooks told Washington in September 2024 that Babygrande had fraudulently induced him to sign the recording contract, and he was treating it as unenforceable or non-existent: "But I'm operating as if that paperwork doesn't exist! It was fraudulently acquired[.]

Fraudulently executed on my behalf[.]")). (Hoffmann Decl. Ex. 16). And, aside from the lack of any revenue, or even projected revenue for the recordings at issue, Babygrande has generated virtually no revenue from Cooks' entire back-catalog which Babygrande claims to own. Thus, at most there has been a *de minimus* economic injury to Babygrande as a result of the brief time the recordings were streamed by Cooks to his customers over EVEN's platform, which Babygrande could have fully recouped from Cooks.

And, while Wilson has claims he speaks with Cooks "every day" (Hoffmann Decl. Ex. 2, 5:16-17), Babygrande simultaneously maintains that it cannot provide a current address, necessitating an order from the Court permitting service by e-mail after all other efforts to obtain a current address failed. (Dkt. 251; *see also* Hoffmann Decl. ¶¶ 30-31). Both discovery and the public record reflect, at best, a very strained and adversarial relationship between Babygrande and Cooks, including as discussed above, that Cooks disputes Babygrande's ownership of his works and has publicly expressed dissatisfaction with the relationship. (*Id.* ¶¶ 38-39, Exs. 19-22). This case is not about a technology company committing massive copyright and trademark infringement: it is about the dollar signs in Wilson's eyes, trying to recoup his lost investment in Cooks, and has nothing to do with the brief period of time Cooks' works were available on EVEN's platform. Even Cooks told Wilson the lawsuit was a waste of time. (*Id.* Ex. 17, at B001464).

In summary, the damages claims in this case are wildly overstated, not grounded in fact or law, and have been asserted in bad faith for improper purposes.

### B. Babygrande and its counsel improperly sued the Investor Defendants for leverage.

Babygrande's fraudulent behavior and abuse of process precedes the calls captured on the August Recordings. In fact, the Court has already made a substantive ruling based on Wilson and Parness's prior bad-faith conduct, yet they have not ceased their impermissible behavior. As the

Court may recall, early in the action, Babygrande named eight (8) entities and individuals as defendants based on a press release about EVEN's launch.[9] Defendants moved to dismiss the Investor Defendants (Dkt. 51 *et seq.*), including a request for attorneys' fees and costs because the claims against the Investor Defendants were brought solely for harassment and were objectively unreasonable." (Dkt. 51-1, at 1).

There was no possible reason to bring such objectively unreasonable claims "other than harassment and an effort to seek deeper pockets," or as a fishing expedition to obtain irrelevant financial and investment discovery that had nothing to do with the claims, which is yet another example of sanctionable discovery misconduct. (*Id.* at 25). The August Recordings show that EVEN's educated suspicions were accurate. While promising Washington he would not "betray" him if Babygrande was able to coerce EVEN into a "lucrative settlement," Wilson stated:

> But I think if I'm walking there with that kind of bombshell information, they're going to want to settle this quickly to make it go away. And **I don't know who has the deep pockets or investors that will play ball**, but if we come up with a number and then this new deal is going to help you pick up and pay it or something, then it could all be structured in a way where they can handle it or pay back whoever gives them the money to settle it or whatever it is, you know?

(Hoffmann Decl. Ex. 8, 16:6-15) (emphasis added). This statement by Wilson is illustrative of Babygrande and its counsel's pattern of abusing the judicial process and their disrespectful, unethical, and fraudulent habit of disregarding the Court's time and resources. Babygrande and its counsel used federal pleading and this Court as a fishing expedition to identify and try to leverage the "deep pockets" of EVEN's investors.

The Court granted the motion to dismiss although it deferred on the appropriate sanctions:

> Counsel admitted at the last conference that the sole basis for suing these investor defendants is the fact that they were listed as potential investors in news articles.

[9] These parties were collectively referred to as the "Investor Defendants," even though most of them were not actually direct investors in EVEN.

> Plaintiff has no information that these defendants were at all involved in any of the claims at issue in this case.

(Dkt. 72, 21:22-22:6). At the time, the Court felt that the issue of bad faith was not yet ripe but acknowledged the very real chance this was just the start of a pattern stating:

> At this point, we are early in the discovery and litigation process. **As we proceed, there may be additional facts that indicate improper motive or special need for deterrence**——that is particularly true if plaintiff's remaining claims fail before trial, but we are not there yet. Therefore, I deny the motion for fees and costs at this juncture, without prejudice to renewal once claims against the EVEN defendants are resolved.

(*Id.* 24:2-9) (emphasis added). That juncture has now arrived.

Babygrande's discovery misconduct is not isolated to the Investor Defendant fishing expedition. It has engaged in a sustained pattern of discovery abuse that has vexatiously multiplied these proceedings. As is well documented elsewhere, during discovery Babygrande and Parness have repeatedly failed to comply with their obligations, necessitating motion practice and delaying EVEN's ability to take any depositions, including depositions of Wilson and Cooks. (*See, e.g.*, Dkts. 100, 199, 200, 212, 234, 239, and 251). Even in the face of this motion, Babygrande still failed to comply with the Court's order to produce all of its revenue information by March 25th. By withholding key expense and revenue information, and violating the Court's orders multiple times, Babygrande has shown it does not "deserve" (in Wilson's words) the forum provided by this Court. (Hoffmann Decl. ¶¶ 14-31, 35-36).

This pattern of noncompliance is precisely the type of conduct Rules 11 and 37, 28 U.S.C. § 1927, and the fee shifting provisions of the Copyright and Trademark Acts are designed to address. Given the persistence and willfulness of these violations and the delay and prejudice they have caused, sanctions are not only warranted, but they are necessary. The Court should exercise its discretion to impose appropriate sanctions against Babygrande and Parness.

**C. Babygrande added Washington as a defendant in an effort to use him as leverage.**

The recordings likewise establish that Washington's presence in the case served a strategic purpose, not a substantive one. Wilson explained to Washington that even though Wilson (incorrectly) believed EVEN was responsible for Washington's activities set forth in paragraphs 49-52 of the FAC (despite Washington saying the opposite), Washington was merely being kept in the case as "leverage against EVEN," with Wilson explaining that once a settlement is reached, "we don't need the leverage anymore." (Hoffmann Decl. Ex. 8, 85:1-3). This admission is highly informative of the manner in which Babygrande and Parness think they can abuse the auspices of the Court.

Just as with the Investor Defendants, adding or keeping a party in a litigation solely to increase settlement pressure or gain proprietary information, is the very definition of abuse of process, including violating Fed. R. Civ. P. 11 and 28 U.S.C. § 1927. The Court has the inherent power to deter fraud and frivolousness and manage its own affairs to protect the system against such an obvious display of bad faith. *See Chambers,* 501 U.S. at 45. Dismissal is therefore warranted.

## IV. PARNESS WAS A PARTICPANT, NOT AN INNOCENT BYSTANDER

The August Recordings also demonstrate that Parness was aware of and involved in the underlying scheme prior to the August 13th call, and an active participant once he joined the discussion. Washington repeatedly references prior communications with Parness about the same "inside information." These are not isolated remarks—they reflect an ongoing dialogue in which Parness was being consulted about the very information and strategy later discussed on the recorded calls. At one point Wilson asks Washington if he has told Parness about the proprietary EVEN information that Washington was offering to share, to which Washington replies on the

affirmative. (Hoffmann Decl. Ex. 6, 13:22-14:4). Interrogatory responses (provided nearly two months late and only because the Court invited a separate motion at the March 11th hearing (Dkt. 237)) confirm that Parness spoke with Washington in advance of Washington's call with Wilson on August 5th. (*Id.* Ex. 13, Babygrande "Revised" Responses), and Wilson refers numerous times to his separate calls with Parness about Washington's proposal. (*See, e.g.*, Hoffmann Decl. Ex. 8, 26:17-18; *see also* Ex. 10, at 16-18). In other words, by the time Parness joined the conversation on the 13th, he was not hearing these issues for the first time but was rather stepping into a discussion in which he was already involved.

In response to EVEN's discovery requests, Parness should have produced *at minimum* all of the communications between himself and Washington and between his client and Washington, which he earlier claimed, falsely, that he did. (*See id.* ¶¶ 20-22, Ex. 11). The August Recordings confirm that this was not an honest representation. (Hoffmann Decl. Ex. 10, at 16-18). In the August Recordings, Washington references conversations he had with Parness that were not produced to EVEN before the March 11th conference. (*See, e.g.,* Ex. 2, 3:8 ("Hillel had double-emailed me"); 30:20 ("what I was told by Hillel"); 33:25-34:1 ("I told Hillel that…was a stupid offer to make"); 53:2 ("I'm going to talk to Hillel")). There are at minimum several email chains between Parness and Washington that neither Parness nor Washington produced to EVEN despite being ordered to do so. (*Id.* ¶¶ 24-25). Parness attempted to explain his convenient ability to produce unseen communications when he felt they benefitted him as previously "privileged as settlement communications." (Dkt. 233, n 1). But this argument was absurd: F.R.E. 408 is an admissibility rule, not a discovery rule. *Rates Technology Inc. v. Cablevision Systems Corp.*, 05-cv-3583, 2026 WL 3050879 at *3, (E.D.N.Y. Oct. 20, 2026).

When Parness joined the August 13, 2024 call, he did not make any attempt to stop the extortion plot or distance himself from what is plainly improper conduct. (*See* Ex. 10, at 20-23). He listens as Wilson and Washington describe using purported insider information as leverage to force a settlement from EVEN. (*Id.*). At no point does he instruct them to cease or attempt to terminate the discussion. Instead, Parness engages. While he does caution that, for purposes of avoiding the appearance of impropriety, any written communications should not look like Wilson was "chasing inside information" that Washington "shouldn't be giving," (Ex. 8, 41:7-11), that did not deter his further involvement. Rather, it both reflects Parness's recognition that the conduct being discussed is improper and demonstrates how he advised about keeping the behavior clandestine. Wilson immediately responds by stating that, if successful, "it won't reach the courts." Parness agrees: "For sure. It wouldn't reach the courts. If it turns out to be the 'golden ticket'… it will end the case." (*Id.* 42:11-12).

Based on the August Recordings, at a minimum, the Court should order production of Parness' communications with Wilson during the relevant time frame, under the crime-fraud exception to the privilege, rather than taking Parness' word that he was not actively involved in the plot. *United States Securities and Exchange Commission v. Collector's Coffee Inc.*, 338 F.R.D. 309, 316 (S.D.N.Y. 2021) (while the crime-fraud exception does not extend to all communications made in the attorney-client relationship, it is sufficient "that the attorney-client communication reasonably relate to the crime or fraud," and "applies even to an attempted perpetration of a crime") (internal quotations omitted).

Parness was also obviously involved in the effort to obtain leverage by improperly adding the Investor Defendants to the case. A press release, or articles derived from one, is not an appropriate method for identifying the proper parties to a litigation or their jurisdictional contacts.

Nor was there anything in the press release that could plausibly lead an objective person to the conclusion that any of the Investor Defendants could be liable for secondary copyright or trademark infringement. An attorney cannot genuinely expect a court to believe that this was a good-faith attempt to bring claims or properly identify parties. This is not the good-faith conduct required by Rule 11.

The claims against the Investor Defendants were a meritless ruse by Babygrande and its counsel to intimidate EVEN and interfere with its business. Despite admitting he had no legitimate basis to name eight additional defendants, Parness refused to voluntarily dismiss them even after both Defendants and the Court gave him an opportunity to withdraw the claims before motion practice was necessary, forcing needless Court intervention to secure dismissal. (Dkts. 51 *et seq.*, 72). This conduct was not merely inefficient, it was a deliberate and improper imposition on both the parties and the Court, warranting appropriate sanctions. EVEN addressed the impropriety and vexatiousness in its associated request for costs and fees.

In summary, in the August Recordings, at no point did Parness object to the use of purported insider information as leverage. At no point did he advise compliance with discovery obligations or caution against manipulating the timing of disclosures. At no point did he attempt to halt a conversation that, on its face, involved the leveraging of non-public information for settlement advantage. And where Parness does speak, his statements further the strategy rather than restrain it. Parness was aware of the scheme before the call, joined the call with that knowledge, and participated in a discussion centered on using purported insider information to pressure EVEN into settlement while avoiding judicial oversight. In totality, this is a repeated pattern of bad faith and should be subject to monetary sanctions and dismissal of the case.

The August Recordings shed much light on Babygrande's improper motives and its counsel's facilitation of those motives by abusing the judicial process. The extreme nature of the Recorded Speakers' conduct could not more unequivocably constitute a "special need for deterrence." The Court should grant both the Investor Defendants and EVEN all of their fees and costs.

## V. THE APPROPRIATE REMEDIES FOR THE BAD-FAITH CONDUCT

When deciding on the proper sanction to award, courts in the Second Circuit apply a multifactor test, including the consideration of: (a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party has been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party. *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 138 (S.D.N.Y. 2000). Each of these factors points to a dismissal with prejudice and a complete award to EVEN for its fees and costs.

In addition to compensating the victimized party, the sanctions awarded by a court should take into consideration the deterrence of future conduct and the integrity of the court. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (upholding outright dismissal as a sanction for failure to comply with a discovery order in the face of prior warnings; holding that while severe, a dismissal is "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent," and finding district court did not abuse its discretion in light of the "flagrant bad faith" of the party and the "callous disregard" by counsel of its responsibilities); *Chambers,* 501 U.S. at 50-51 (awarding the entirety of fees and costs, where sanctioned party's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate

a fraud on the court, and the conduct sanctionable under the Rules was intertwined with conduct only the inherent power could address"). Here, not only did the Court already warn Wilson that his behavior might lead to case-terminating sanctions (Dkt. 70), but he was the main proponent of the extortion plot.

Courts have the inherent power to impose sanctions upon a party or attorney who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Chambers*, 501 U.S. at 45 ("outright dismissal of a lawsuit…is within the court's discretion."); *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (court "may exercise its inherent power to sanction a party or an attorney" to manage its own affairs so as to achieve the orderly and expeditious disposition of cases; "we also impose sanctions where the conduct of the sanctioned litigant or attorney evinces bad faith or an egregious disrespect for the Court or judicial process.").

An attorney may be subject to sanctions under Rule 11, *inter alia*, for filing, submitting a pleading, motion, or paper for an improper purpose; or for presenting frivolous claims in a pleading. Fed. R. Civ. P. 11(b)-(c). The underlying purpose of Rule 11 sanctions is to punish deviations from proper standards of conduct with a view toward encouraging future compliance and deterring future violations. *McKenzie-Morris v. V.P. Records Retail Outlet, Inc.*, 338 F.Supp.3d 333, 338-40 (S.D.N.Y. 2022) (finding Rule 11 Sanctions warranted where attorney fails to withdraw claim or motion after learning it is groundless). Sanctions under § 1927 are proper when the attorney acts so completely without merit as to require the conclusion that the attorney acted with improper purpose. Rule 37 also permits the imposition of sanctions, including case-terminating dismissals. Fed. R. Civ. P. 37(b)(2)(A)(v) and (c)(1)(C).

### A. Dismissal With Prejudice Is Warranted

Courts have used their inherent power to impose case-terminating sanctions for bad faith and vexatious behaviors or fraud on the court, or for abuse of process. *See, e.g., Ceglia v. Zuckerberg*, 600 Fed. App'x. 34, 36-37 (2d Cir. 2015) (summary order) (affirming district court's dismissal for conduct abusing the judicial process, including frivolous claims and spoilation of evidence); *Pitre v. City of New York*, 731 F.Supp.3d 661, 665 (S.D.N.Y. 2024) (dismissal where plaintiff failed to provide basic proof for his damages claims).

The behavior of Babygrande (and Parness) throughout this proceeding present a textbook example of bad-faith litigation, including: (a) the knowingly inaccurate allegations throughout the initial complaint when Babygrande knew that the source of the works was its own artist; (b) the excessive damages claims; (c) the deleterious conduct in discovery, withholding all revenue information, hiding Cook's contact information, withholding communications with Washington based on a frivolous Rule 408 argument, and responding to Interrogatories two months late and only after a motion to compel had been filed; the frivolous inclusion of the Investor Defendants to gain improper leverage with no factual basis; the failure to remove Paragraphs 49-52 from the FAC when learning the allegations were not true; and the failure to heed the Court's earlier warning not to make extrajudicial threats. (Dkt. 70). The extortion plot revealed in the August Recordings, deserving of case-terminating sanctions on its own, is thus just the tip of iceberg, conclusively establishing willfulness and bad faith by both Babygrande and Parness.

Lesser sanctions are not appropriate because they would still reward Babygrande with the possibility (if remote) of a runaway jury giving it a large verdict based on hyperbole and invited speculation, when the potential economic damages are minimal. This case should have been settled early based on the lack of economic injury to Babygrande, who could have recovered every

penny of its economic loss by recouping the funds EVEN paid to Babygrande's own artist for something he did out of desperation because Babygrande did not release his works.

This Court's prior warnings against Babygrande's threats would also be rendered ineffective if lesser sanctions were awarded. The prejudice to EVEN and the Investor Defendants for the time and money wasted in defense of this lawsuit, including the sideshow that efforts to obtain EVEN's own devices back from Washington has become, can only be cured by dismissal and the return of the entirety of Defendants' fees and costs. It is thus clear that dismissal is the most appropriate remedy for this matter. *Arista*, 633 F. Supp. at 138 (terminating affirmative defense for engineering of witness unavailability and non-compliance with orders); *see also* cases cited on page 21 above.

### B. The Court Should Also Impose Fees and Costs Against Babygrande and Parness

The Court should also impose monetary sanctions in the form of the entirety of EVEN's attorney's fees and costs. *Chambers*, 501 U.S. at 45 (the "less severe sanction of an assessment attorneys' fees is… undoubtedly within a court's inherent power."). This is so particularly in light of the fee shifting provisions in the U.S. Copyright and Trademark Acts. Courts have awarded costs, expenses, and fees against counsel for violations of § 1927 for conduct much less egregious. *Balestriere Fariello v. Gimlet Media, Inc.*, 24-cv-2155, 2025 WL 2925061, at *3 (2d Cir. Oct. 15, 2025) (summary order) (sanctions imposed against attorney under § 1927 and against the party under the Trademark Act, 15 U.S.C. § 1117 where appellant brought frivolous claims and attempted to extort nuisance settlement from defendant by advancing unsubstantiated legal theories, in particular for relying on "baseless damages theories.").[10]

[10] Relatedly, New York law allows for an award of sanctions in the form of reimbursement for actual expenses reasonably incurred and reasonable attorneys' fees, resulting from frivolous conduct undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another. 22 NYCRR 130-1.1. Conduct is

Both the Copyright Act and Trademark Act also provide the Court with discretion to award the Investor Defendants and EVEN their attorneys' fees and costs against both Babygrande and its counsel pursuant to 17 U.S.C. § 505, 15 U.S.C. § 1117, and 28 U.S.C. § 1927. *See, e.g., Viola Sportswear, Inc. v. Mimun*, 574 F.Supp. 619, 621 (E.D.N.Y. 1983) (where the plaintiff refused to withdraw its claims after learning they were unfounded, awarding fees and costs under both 15 U.S.C. § 1117 and 28 U.S.C. § 1927); *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77-78 (2d Cir. 1986) (same, awarding attorneys' fees, under each of 17 U.S.C. § 505, 15 U.S.C. § 1117, and 28 U.S.C. § 1927, where plaintiff brought suit for the coercive purpose of "joining in the profits" of the defendant's products); *see also Baker v. Urban Outfitters, Inc.*, 431 F.Supp.2d 351, 364 (S.D.N.Y. 2006) (finding that it was "improper, unreasonable, and vexatious" for plaintiff's counsel to maintain baseless claims "for so long before agreeing to dismissal," *aff'd*, 249 Fed.App'x. 845 (2d Cir. 2007). There was no reason to bring the objectively unreasonable claims against the Investor Defendants based solely on a press release other than harassment and an effort to seek deeper pockets, serving no "laudable motive." *See New Sensor Corp. v. CE Distribution LLC*, 367 F.Supp.2d 283, 288 (E.D.N.Y. 2005).

Because the egregious behavior in this has been conducted by both Babygrande and Parness, the Court should impose fees and costs against them jointly. *Balestriere Fariello*, 2025 WL 2925061, at *3. Going far beyond mere lapses in judgment, Parness' participation in the August Recordings renders his misconduct undeniably deserving of sanctions in the form of disgorgement of any fees he has received.

---

frivolous if it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another. 22 NYCRR 130-1.1(c)(2). Such sanctions are goal-oriented, with goals including preventing the waste of judicial resources and deterring vexatious litigation and dilatory or malicious litigation tactics. *13 East 124 LLC v. J&M Realty Services Corp.*, 222 A.D.2d 446, 448 (1st Dep't 2023). It is "well settled" that an attorney in violation of the Disciplinary rules is not entitled to any legal fees for services rendered. *Matter of Satin*, 265 A.D.2d 330 (2d Dep't 1999).

### C. In the Alternative, the Court Should Strike Paragraphs 49-52 of the FAC and Order Other Relief

Should the Court deny EVEN's motion for case-terminating sanctions, in the alternative, the Court should, at a minimum, strike the allegations in Paragraphs 49-52 of the Complaint. The Court should also rule that Wilson's numerous speculative comments about EVEN's motivations and his hearsay justifications for Cooks' behavior, which are inconsistent with Cooks' texts and public pleas for help terminating his contract, are not admissible. *See Arista*, 633 F.Supp. at 443 (granting adverse inference as an appropriate sanction); *Musi Inc. v. Apple Inc.*, 24-cv-06920-EKL, Order Granting in part Motion for Rule 11 Sanctions, Dkt. 97 (N.D. Cal. Mar. 16, 2026) (striking allegations in complaint). Further, the Court should rule that Babygrande is not entitled to seek damages beyond EVEN's extremely limited profits if this case goes to trial. Babygrande and Parness have withheld the production of key documents, filed frivolous claims, and violated the Court's orders to provide information, such as Cooks' address and revenue information. Doing so has thus far deprived EVEN of access to a key witness and crucial information, in addition to wasting the time and resources of both the Defendants and the Court.

## VI. <u>CONCLUSION</u>

For the reasons outlined above, EVEN and its counsel respectfully request that this Court enter an Order granting their request for sanctions, as follows:

(1) Dismissing this case with prejudice;

(2) Ordering Babygrande and Parness to pay all of EVEN's legal fees and costs;

(3) Ordering that communications between Parness and Babygrande are not privileged under the crime-fraud exception; or

(4) In the alternative, to some or all of the preceding remedies: striking paragraphs 49-52 of the FAC; prohibiting speculation about EVEN's motives at trial; prohibiting Wilson's testimony

at trial to matters within his own actual knowledge and that are inconsistent with Cooks' private and public statements; and limiting Babygrande's damages.

Dated: March 27, 2026
New York, New York

Respectfully submitted,

By: David Leichtman

David Leichtman (DL 7233)
Sherli Furst (SF 7886)
Emma J. Hoffmann (EH 9673)

1345 Avenue of the Americas, 11th Floor
New York, New York 10105
Tel: (212) 370-1300
dleichtman@egsllp.com
sfurst@egsllp.com
ehoffmann@egsllp.com

*Attorneys for Defendants EVEN Labs Inc. and Enrique "Mag" Rodriguez*

**<u>WORD COUNT CERTIFICATION</u>**

Pursuant to Your Honor's Individual Rule 4(b) and Local Civil Rule 7.1, this is to certify that the EVEN Defendants' Memorandum of Law in Support of their Motion for Case-Terminating Sanctions and Other Relief contains 8,738 words, exclusive of the caption, table of contents, table of authorities, signature block, and this certification. This therefore certifies that this document complies with the word-count limit of 8,750 words.

Dated: March 27, 2026

**ELLENOFF, GROSSMAN & SCHOLE LLP**

Emma J. Hoffmann
1345 Avenue of the Americas, 11th Floor
New York, New York 10105
ehoffmann@egsllp.com

*Attorney for the EVEN Defendants*